Per Curiam:
This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report and opinion filed on September 18, 1966. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by the parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s findings, opinion and recommended, conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of $102.80.
opinion oe commissioner*
Day, Goimnissioner:
This is a contract action. The question presented is whether defendant is liable for all or any of the balance of $3,583.06, due for certain credit purchases made by a Naval officer in the name of the “U.S. Naval Mission to Colombia.” It is concluded that defendant is liable for a portion of the balance due, to the extent of $102.80.
Plaintiff, a Panamanian corporation having its principal place of business in Panama City, specializes in the sale of imported goods, including wine and liquor. Since the Republic of Panama accords to citizens of the United States *1043 the right to prosecute claims against the Republic in its courts, the plaintiff is entitled under the reciprocal provisions of 28 U.S.C. 2502 (Alien’s Privilege to Sue) to have its claim against the defendant brought in this court. The controversy 'arises from the following facts:
The United States Naval Mission to Bogota, Colombia, maintained, pursuant to the authority of the Secretary of the Navy, a specific fund for the payment of expenses (including wine and liquor) for official entertaining. The wine and liquor for the Naval Mission was purchased by the Mission pilot during his frequent trips to the Panama Canal Zone. The Mission pilot 'also purchased wine and liquor for the U.S. Embassy and for the personal use of the members of both organizations. Prior to his departure for Panama, the Mission pilot received individual wine and liquor orders from which he made a consolidated order that he presented to the vendor upon his arrival in Panama. The vendor filled the order and delivered the wine and liquor in bond to the Mission airplane. The Mission pilot acknowledged its receipt and then transported the wine and liquor back to Bogota for distribution to the various principals.
In May 1956, Lt. S. Dixon Willson (hereinafter referred to as Willson) was assigned to the Naval Mission as Mission pilot. At first, Willson followed the practice established by his predecessor of purchasing the ordered wine and liquor on a cash basis with checks and money given him in advance of each trip. Willson found that it would be more convenient for him to deposit the cash and the checks (Government and personal) in his own personal checking account and then make payment therefrom after the checks had cleared (which was generally sometime after the wine and liquor had been delivered). Consequently in November 1956, Willson opened a revolving credit account in his own name with a liquor dealer other than plaintiff and started purchasing the wine and liquor on credit. Since many of the personal checks given to him by individuals were made out for the estimated price of the wine and liquor, the revolving account enabled Willson to first order and make delivery, and then receive payment for the exact amount. This is the payment procedure that the U.S. Embassy and its members regularly followed after the revolving credit account was established. *1044 However, the Naval Mission continued to give Willson a cheek in advance of each purchase, except on one occasion (in July 1957) when the Government check for the wine and liquor followed delivery of liquor for the Naval Mission.
In May 1957, the airfield in the Canal Zone which Willson had been using, was closed. Consequently the Naval Mission made arrangements to use the Albrook Air Force Base near Panama City for loading supplies for transport to Bogota. Willson discontinued purchasing from the other liquor dealer and made arrangements to purchase the wine and liquor on credit from plaintiff in the name of the “U.S. Naval Mission to Colombia.” Willson dealt with the plaintiff’s general manager, Rafael C. Henriquez, who was aware that the wine and liquor purchases were being made for three different principals — the Naval Mission, the U.S. Embassy, and the individual members of both.
With each delivery, invoices were given to Willson or his copilot, billed to the Naval Mission or the U.S.Embassy. To accommodate Willson, Henriquez specifically earmarked in the ledger those purchases made for the U.S. Embassy and its personnel.
From May 1957 through August 1958, Willson purchased $11,841.41-worth of wine and liquor from the plaintiff, which included $4,800.72-worth purchased for the U.S. Embassy.
During this period, Willson made six purchases for the Naval Mission amounting to $1,230, with the last purchase being made in April 1958. That purchased for the personal use of the 'individuals attached to the Mission and to the Embassy totaled $5,810.69.
Plaintiff’s ledger shows that the balance due in the “U.S. Naval Mission to Colombia” account steadily increased, reaching a high of $4,184.56 in August 1958. It is clear from what has been recited above, that not all of the money given to Willson for the purchase of wine and liquor was paid over to plaintiff.
Various cablegrams in evidence point up the fact that Will-son and the plaintiff had problems in connection with the payment of the wine and liquor by Willson’s personal check. For instance in May 1958, Willson cabled the plaintiff requesting that a check for $644 be held for four days *1045 before being deposited by the plaintiff for payment.[1] In addition, the exhibits in evidence[2] show that plaintiff, on two occasions (May 8 and May 20,19'58) loaned Willson $1,200 for a total of $2,400. Plaintiff knew at all times that the checks it received in payment for all wine and liquor purchased by Willson were 'his own personal checks and not Government checks issued in the usual course of business.
In July 1958, Willson complained to the officer in charge of the Naval Mission, Oaptain Ellsworth, that he was having problems in his personal checking account, due to the amount of checks he was carrying for “personal and official purchases.” Ellsworth then authorized Willson to open a separate checking account in the name of the “U.'S. Naval Mission to Colombia” at the Chase Manhattan Bank in Panama. The stated purpose for the account was to enable Willson to cash the checks and “simplify the purchasing.” A month later, Ellsworth ordered this checking account closed because of Willson’s apparent misuse. One check only was drawn on such checking account payable to the plaintiff for Naval Mission wine and liquor. This was in the amount of $227 'and was dated August 20,1958.
Soon thereafter, the pace of events rapidly increased. On September 8, 1958, Willson gave Henriquez a $2,000 check for payment on the liquor account. The check was returned for insufficient funds. At Willson’s request, Henriquez redeposited the $2,000 check, which was again returned unpaid on September 21, 1958. By this time, Willson had completed his tour of duty at the Naval Mission and was officially detached therefrom awaiting return to Washington, D.O., where he intended to resign from the Navy.
Henriquez cabled Willson’s replacement that the $2,000 check had been returned unpaid and that the balance due remained at $4,178.06. This was the first time that Ellsworth became aware of the outstanding indebtedness to plaintiff.
When confronted with the cable, Willson acknowledged that he 'had been paid in full for all purchases that he had made from the plaintiff, explaining that he considered the debt to be personal and stating ('among other things) that *1046 be bad just sent an additional check to Henriquez in the amount of $1,000. With this explanation, Willson was permitted to depart for Washington, D.C. Two days after Willson’s departure, Ellsworth was informed that the indebtedness to the plaintiff was not in the name of Willson, but was in the name of “U.S. Naval Mission to Colombia” and that a portion thereof was designated as that of the U.S. Embassy.
By letter, Ellsworth informed Willson of his discovery stating, in particular, his concern over the involvement of the U.S. Embassy. Realizing that he would not be released from the Navy until the U.S. Embassy and the Naval Mission were exonerated from the indebtedness, Willson requested Henriquez (on separate occasions) to apply the proceeds of the $1,000 check to the Embassy portion of the account and to cancel the entire Naval Mission account, with assurances that adequate personal arrangements would be made to pay the amount due. Henriquez did apply the proceeds of the $1,000 check in discharge of the Embassy portion, but refused to cancel the entire account.
Upon recommendation of Ellsworth, the Navy permitted Willson to return to Colombia and Panama in the hope that he would settle the matter. Nine days after his return to Bogota, Willson was found dead — apparently a suicide. Willson’s activities during this nine-day period are not disclosed in the record.
Both parties agree that the balance due on the account in the name of the Naval Mission is $3,583.06, and thait the portion of the account concerned with the purchases made by the U.'S. Embassy and its personnel has been satisfied and canceled.
The general principle controlling the disposition of this case was enunciated by the Supreme Court in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947), wherein the court stated:
»í» •!*
* * * Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. * * * And *1047 this is so even though, as here, the agent himself may-have been unaware of the limitations upon his authority. * * *
* * * * ❖
Pursuant to this principle, the solution to the present controversy must be determined by focusing on the authority Willson actually had (either express or implied) and not upon the authority which others may have supposed he 'had.
There is no question but that Willson was authorized to purchase wine and liquor for the Naval Mission in the amount of $1,230. He was also authorized to use the Mission airplane to transport wine and liquor purchased for the individual members of the Naval Mission. The pivotal issue is whether Willson was authorized to purchase wine and liquor for the Naval Mission and its members, on credit, in the name of an agency of the United States Government.
Absent specific Congressional authorization, an agent of the Government is not authorized to pledge the Government’s credit for the payment of the personal obligations of its employees. Thus, neither the officer in charge of the Naval Mission, nor Willson, was authorized to pledge the Government’s credit in the purchase of wine and liquor for the personal use of the Mission personnel. The fact that Willson used the Mission airplane for the transportation of the personal liquor and that plaintiff was presented with a consolidated order which included separate orders by the Naval Mission and its personnel, does not overcome the basic lack of credit authority. Plaintiff cannot rely upon the fact that a checking account in the name of the “U.S. Naval Mission to Colombia” was established at the Chase Manhattan Bank in Panama for payment of the wine and liquor purchased, because the officer in charge of the Naval Mission was without authority to open such an account for the payment of liquor purchased for the Mission personnel. Therefore, it must be concluded that the defendant is not liable for that portion of the balance due that represents purchases made by Willson for the Mission personnel.
With respect to whether Willson was authorized to purchase wine and liquor for the Naval Mission, on credit, the answer is not as clear. By authority of the Secretary of the Navy, the officer in charge of the Naval Mission was author *1048 ized to purchase wine and liquor (in 'a limited amount) for the official entertaining 'conducted by the Naval Mission. To this limited extent, the officer in charge was authorized to pledge the Government’s credit in payment of such wine and liquor. Whether the officer in charge of the Naval Mission redelegated his authority to Willson is a matter to be gleaned from the facts.
American Law Institute Restatement of the Law (Second) Agency 2d, § 65 (2) states:
Unless otherwise agreed, authority to purchase includes: (a) authority to buy for money only and not on credit if the principal supplies the funds: or (b) authority to pledge the principal’s credit upon usual or reasonable terms if the principal does not supply the funds.
See 55 A.L.R. 2d 74, § 8.
From the facts it cannot be said that the Naval Mission had an established practice of purchasing wine and liquor from plaintiff on credit prior to Willson’s dealings with plaintiff. The facts disclose that it was the rule (rather than the exception) to draw or endorse over to the Mission pilot a check in advance of each purchase for the Naval Mission. Thus, each time the Naval Mission ordered wine and liquor and gave Willson a check in advance for payment thereof, the only authority given Willson was to pay on a cash basis. If Willson, after receiving payment in advance, desired to purchase the ordered wine and liquor on credit, the Naval Mission could not be held accountable.
On one occasion — in July 1957 — Willson was given a check in the amount of $202, in payment for wine and liquor that had already been delivered to the Naval Mission in Bogota. On this occasion, the officer in charge of the Naval Mission authorized Willson to receive delivery before payment was made, implicitly requiring some form of credit extension by plaintiff. This does not mean, however, that this single credit transaction gave Willson authority to purchase subsequent Naval Mission orders on the Government’s credit. On all subsequent purchases for the Naval Mission, Willson was again given payment in advance, thus precluding any delegation of credit authority.
Plaintiff asserts that hi July 1958, when Ellsworth authorized Willson to open a checking account in the name of the *1049 “U.S. Naval Mission to Colombia” in effect, he ratified the previous credit transactions. The only legal significance that can be attributed to the establishing of the checking account is that Willson was authorized, it is argued, to purchase the wine and liquor for the Naval Mission on credit after July 1958. Such granting of authority, if there was such grant, could not have retroactive application because Willson had already been given checks in advance for the previous Naval Mission purchases, except on the one occasion noted.
It is concluded that since the Naval Mission failed to provide Willson with funds in advance to purchase the 1202-worth of liquor it ordered in July 1957, the Naval Mission impliedly authorized Willson to pledge the Government’s credit to make the purchase. Consequently, the defendant must bear the loss for that portion of the balance due represented by the single transaction.
The question becomes: What portion of the balance due is represented by the $202 transaction? Certainly, defendant is not liable for the entire $202, 'because the balance due for the total of $7,040.69 of wine and liquor purchased for the Naval Mission and individuals attached to both the Embassy and the Mission has been reduced to $3,583.06. Since Willson did not specify that the payments made on account were to be applied to any specific purchase or purchases (except those made for the U.S. Embassy) the plaintiff could properly apply the payments to reduce the balance irrespective of when the purchases were made. Thus, it must be assumed that the payments were prorated to all the purchases which reduces the $202 amount to $102.80.
Therefore, the plaintiff is entitled to judgment in the amount of $102.80.
FINDINGS or Fact
1. Plaintiff is a Panamanian corporation having its principal place of business in Panama City. At all times material to this suit, plaintiff was engaged in an importing business, which included the sale of wines and liquors.
2. The Eepublic of Panama accords to citizens of the United States the right to prosecute claims 'against the Ee-public in its courts. Therefore, under the reciprocal provi *1050 sion of Title 28 U.S.C. 2502 (Alien’s Privilege to Sue) plaintiff is entitled to 'bring its contract claim against the defendant in this court.
3. Plaintiff seeks to recover the balance due ($3,583.06) on a credit account established May 23, 1957, by Navy Lt. S. Dixon Willson, in the name of the “U.S. Naval Mission to Colombia.” The account extends over a period of some 16 months and reflects the purchase of $11,841.41-worth of wines and liquors, with the last purchase being made in August 1958 and the last payment on account posted in October, 1958.
4. The record in this case consists wholly of stipulated documents and written statements of individuals, the latter of which the parties have agreed constitutes the testimony of their witnesses if they were called to testify.
5. The U.S. Naval Mission at Bogota, Colombia, maintained pursuant to the authority of the Secretary of the Navy, a “representation fund” ranging from an allotment of $1,000 to $1,200 per quarter, for the purpose of incurring expenses, including the purchase of wine and liquor for official entertaining.
6. A Naval flying officer (referred to as the Mission pilot) was assigned to the Mission for the purpose of transporting goods and personnel to and from Bogota and military airfields in the Panama Canal Zone and also for the purpose of transporting (among other things) wine and liquor ordered for (1) the official use of the Naval Mission offices in Bogota, Cartagena and Barranquilla, Colombia (2) the official use of the U.S. Embassy in Bogota and (3) the personal use of personnel attached to the Mission offices and the U.S. Embassy. The Mission pilot was authorized to purchase the wine and liquor delivered in bond to the Mission airplane for both the official and personal use. The selection of the wine and liquor vendor was within the discretion of the Mission pilot. However, it was the practice to purchase from private entrepreneurs near the Canal Zone, rather than the U.S. Government liquor outlet in the Canal Zone, because the prices were considerably less.
7. It was normal procedure for the Naval Mission and the U.S. Embassy to issue checks (either made out to or *1051 endorsed to the Mission pilot) in advance for the purchase of wine and liquor for official use. The personnel generally gave personal or endorsed Government checks or money to the Mission pilot in advance for the purchase of their wine and liquor.
8. From July 1954 to May 1956, Lt. Cmdr. Warren Taylor performed the duties of Mission pilot and purchased the wine and liquor from Motta & Motta, liquor dealers in Colon, Republic of Panama, on a “cash ’basis.” The wine and liquor was delivered by Motta & Motta to the Mission airplane at the U.S. Naval Air Station at Coco Solo, in the Canal Zone. There is no evidence that Motta & Motta opened a credit account for the purchases made by Taylor.
9. In May 1956, Navy Lt. S. Dixon Willson was assigned to the U.S. Naval Mission in Bogota as Mission pilot, to replace Lt. Cmdr. Taylor. At first Willson continued to purchase wine and liquor from Motta & Motta on a cash basis. He soon found that it would be more convenient for him to deposit the checks (Government and personal) in his own personal checking account and then make payment therefrom, after the checks had cleared (which was generally after the liquor was delivered). Therefore, in November 1956, he began purchasing the wine and liquor from Motta & Motta on a revolving credit account in the name of “Lt. D. G. Wilson.” Willson further found that instead of receiving checks in advance for the estimated price of the ordered wine and liquor, that it was more convenient to first order and deliver the wine and liquor and then receive payment for the exact amount. The U.S. Embassy and the personnel began using the procedure soon after the revolving credit account was established. But, the Naval Mission generally followed the past course by giving Willson a check in advance for the wine and liquor that it ordered.
19. In May 1957, the Naval Air Station at Coco Solo was closed. As a result, Willson discontinued purchasing wine and liquor from Motta & Motta, leaving a balance due in the account of “Lt. D. G. Wilson” of $1,125.35. By October 1958 the balance had been reduced to $676.05. At no time did Motta & Motta look to the U.'S. Naval Mission or to the U.S. *1052 Embassy for payment, but considered the debt to be the personal obligation of Willson.
11. When the field at Coco Solo (near the Atlantic side of the Canal Zone) was closed, the Naval Mission made arrangements to use Albrook Air Force Base (near Panama City) for loading supplies for transport to Bogota. Willson contacted plaintiff’s general manager, Rafael C. Henriquez, who had previously approached Willson for the purpose of soliciting liquor business, and made arrangements to purchase the ordered wine and liquor from the plaintiff. A credit account was opened in the name of the “U.S. Naval Mission to Colombia.” There is no indication that the officer in charge of the Naval Mission authorized the establishment of such an account. Henriquez was aware of the fact that Will-son was acting as purchasing agent, that a portion of the liquor purchased was ordered by the Naval Mission and the U.S. Embassy, and that the remainder was ordered by the individual members of the respective organizations. However, the record is not clear whether Henriquez knew which order was made by which principal, since he was presented with consolidated orders rather than individual orders.
12. Willson ordered the wine and liquor from Henriquez in Panama City and took delivery at Albrook Air Force Base. Invoices were given to Willson or his copilot, billed to the Naval Mission or the U.S. Embassy. The purchases made in behalf of the U.S. Embassy and its members were specifically earmarked in the plaintiff’s ledger book.
13. Willson ordered and received from the plaintiff $11,-841.41-worth of wine and liquor, with the last purchase 'being made in August 1958. Of this amount, $4,800.72 represents that purchased for the U.S. Embassy, $1,230 represents that purchased for the Naval Mission and $5,810.69 represents that purchased for individuals. Plaintiff’s 'ledger shows that the 'balance in the “U.S. Naval Mission to Colombia” account steadily increased from the opening of the account in May 1957, and reached a high of $4,184.56 in August 1958. The ledger indicates that a small number of purchases were made in cash.
14. The Navy records show that Willson received as payee, or endorsee, the following checks for the purchase of wine and liquor for the Naval Mission during the relevant period:

*1053

The Navy vouchers indicated that the July 18, 1957 check was given to Willson after the ordered liquor 'was physically delivered to the Naval Mission. All of the other cheeks were given to Willson in advance.
15. During the 16-month period from the opening of the credit account in May 1957 through August 1958, Henriquez did not notify the officer in charge at the Naval Mission of the existence of the account in the name of the “U.S. Naval Mission to Colombia” or send a statement setting forth the outstanding indebtedness.
16. In the spring of 1958, on two different occasions, the plaintiff loaned Willson $1,200 for a total of $2,400. On each occasion, the plaintiff drew a check in the sum of $1,200 in favor of Willson as payee.
17. During the fall of 1957, Willson and other members of the Mission became interested in speculating in the peso currency exchange market between Colombia and Panama, using dollars for conversion. Willson was selected to make the transactions and handle the money because he could speak Spanish and made frequent trips between Panama and Colombia. In the beginning, Willson deposited the personal checks given to him for peso speculation in his personal Checking account 'and then gave his personal check to the currency exchange broker. According to Willson:
* * * This operation as such, began in December 1957. In that such an operation involved rather large sums of money, plus speculation on a foreign exchange, I asked that Oapt. Ellsworth check with the Economic section of the Embassy for legality and ethical aspects of the operation before proceeding. He was advised that as far as they were concerned, no objection was pertinent. Capt. Ellsworth then set a limit on amounts which would be purchased corresponding to a person’s average monthly living expenses in Bogota.
*1054 Ellsworth’s statement makes no mention of whether he knew or approved of the peso speculation by the Mission personnel.
18. On or about July 17, 1958, Willson advised Ellsworth (the officer in charge of the Naval Mission) that he was experiencing some difficulty with his personal checking account due to the large number of checks that he was carrying for the liquor purchases. Ellsworth then authorized Willson to open a checking account in the Chase Manhattan Bank in Panama to enable Willson to cash the checks through a separate account and to simplify the purchasing of liquor. The said checking account was established on July 22,1958 in the name of the “U.S. Naval Mission to Colombia.”
19. About a month later, Ellsworth was notified by a Bogota currency exchange brokerage house that they had several outstanding checks (totaling $10,000) in the name of the Naval Mission signed by Willson. According to Ells-worth: “Discussions with Dt. Willson on this subject were unsatisfactory and I ordered the account closed out with the stipulation that any outstanding checks be applied to Lt. Willson’s personal account.”
Pursuant to Ellsworth’s instructions, the checking account was closed on September 2,1958. The bank statement shows that approximately $115,000 passed through the account. Of the 44 checks drawn on the account, only one for $227 was drawn to the plaintiff for liquor payment. Most of the checks ranged in amount from $1,000 to $7,000. It seems quite clear that Willson was using the checking account to facilitate the peso speculation transactions.
20. After the bank closed the checking account in the name of the Naval Mission, all the outstanding checks were charged to Willson’s personal checking account, causing the 'balance in that account to drop below $2,000. Therefore, when Will-son, on September 8,1958, gave Henriquez a check for $2,000 for payment on the liquor account, it was returned for insufficient funds. Willson, soon thereafter, requested Henriquez to redeposit the check. However, it was again returned on September 21, 1958, unpaid. Meanwhile, Willson had completed his tour at the Naval Mission and had been officially detached from the Mission on September 20, 1958. He remained in Bogota until October 5, 1958, awaiting return to Washington, D.C. Knowing of Willson’s detachment, Hen- *1055 riquez cabled Willson’s replacement (Lt. Voorhees) on 'September 29, 1958, that the $2,000 check w'as returned unpaid and that a balance of $4,178.06 was due. Ellsworth states that this was the first time that he was aware of the outstanding indebtedness to the plaintiff.
21. Ellsworth confronted Willson with the communications cable. Willson acknowledged that he had been paid in full for all the purchases he had made from the plaintiff and that he considered the debt recited in the cable to be personal. He further stated that a check for $1,000 had been recently sent to Henriquez and that Henriquez had failed to credit the account with other payments made by checks totaling approximately $3,100, which, if properly credited, would leave a small 'balance due. With tins explanation, Willson was permitted to depart for Washington, H.C., where he intended to resign from the Navy, and thereafter return to Bogota to enter private business. Two days after Willson left for Washington, E.C., Ellsworth was informed that 'the outstanding indebtedness was in the name of the “U.S. Naval Mission to Colombia” with a subaccount in the name of the U.S. Embassy, and that Henriquez did not consider the indebtedness 'to be exclusively Willson’s. Ellsworth was particularly concerned with this development because the U.S. Embassy was involved. This concern was conveyed to Will-son by letter dated October 9, 1958. Kealiz-ing that unless the U.S. Embassy and the Naval Mission were exonerated from the plaintiff’s claim, he would not be released from the Navy, Willson requested Henriquez, on separate occasions, to apply the proceeds of the $1,000 check to extinguish the U.S. Embassy subaccount, and to further cancel the Naval Mission account with the assurances that Willson would make satisfactory personal arrangements to pay the indebtedness within 30 days. Henriquez applied the proceeds of the $1,000 check extinguishing the U.S. Embassy subaccount. However, Henriquez refused to cancel the Naval Mission account. By this time, Ellsworth had recommended that action upon Willson’s resignation be deferred, and that the Navy retain jurisdiction over Willson pending the resolution of this matter.
22. Willson repeatedly insisted that if he was allowed to return to Panama and Colombia, he could straighten out the *1056 matter. The Navy, upon the recommendation oí Ellsworth, permitted Willson to take annual leave for such a purpose, and on or about November 15, 1958, Willson arrived in Bogota, after first having stopped in Panama. The record is silent as 'to what transpired while Willson was in Colombia and Panama, other than to note that 8 days after he arrived in Colombia, Willson was requested to report to the Commandant of the 15th Naval District in Panama for the purpose of an official investigation. That evening, Willson, accompanied by Ellsworth, flew to Albrook Air Force Base in Panama for the purpose of reporting to the Commandant the next day. The next morning, Willson’s body was found hanging in the Bachelor Officers’ Quarters.
23i. On May 4, 1959, plaintiff presented its claim under the Foreign Claims Act, to the Secretary of the Navy. The Navy, in September 1959, informed plaintiff that in its opinion plaintiff’s claim did not come within the purview of the Foreign Claims Act, since the claim sounded in contract rather than tort. On March 1, I960, plaintiff filed its claim with the General Accounting Office. On June 24, 1960, the General Accounting Office rejected the claim, stating that the account in question was the personal account of Willson, and that Willson had no authority to pledge the Government’s credit for the wine and liquor purchased from the plaintiff. Plaintiff then proceeded to present its claim to the Bureau of Supplies and Accounts of the Department of the Navy under the provisions of Public Law 85-804, which claim was transferred to the Bureau of Naval Personnel. On November 21, 1960, the Bureau of Naval Personnel denied the claim, stating that Willson’s transactions with plaintiff were “of a personal nature” and that Public Law 85-804 was not applicable. Plaintiff filed its petition in this court on May 8, 1961.
24. The parties have stipulated that the balance due in the “U.S. Naval Mission to Colombia” account is $3,588.06.
CONCLUSION OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover the sum, of $102.80, and judgment is entered to that effect.

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and, Rule 57(a).

 Defendant’s exhibit 43.

 Plaintiff’s exhibit 13c.